153 F.3d 307
 47 ERC 1161, 29 Envtl. L. Rep. 20,045
 UNITED STATES of America, Plaintiff-Appellee
(96-1802)/Cross-Appellant (96-1992),
v.
TOWNSHIP OF BRIGHTON, Michigan, Defendant-Appellant
(96-1802)/Cross-Appellee (96-1992),
Jack V. Collett, Defendant/Cross-Appellee (96-1992).
 Nos. 96-1802, 96-1992.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 1, 1997.
Decided Aug. 25, 1998.
 
 Robert W. Haviland, Asst. U.S. Attorney, Office of the U.S. Attorney, Flint, MI; Andrew C. Mergen (argued and briefed), U.S. Department of Justice, Land & Natural Resources Division, Washington, DC; Maureen M. Katz, U.S. Department of Justice Environmental Enforcement Section, Washington, DC, for Plaintiff-Appellee/Cross-Appellant.
 
 
 1
 Edward V. Keelean (briefed), Juliet E. Pressel (argued and briefed), Guy P. Hoadley (briefed), Wise & Marsac, Detroit, Michigan, for Defendant-Appellant/Cross-Appellee.
 
 
 2
 Michael F. Merritt, Kizer Law Firm, Howell, MI, for Defendant/Cross-Appellee.
 
 
 3
 John H. Bauckham (briefed), John K. Lohrstorfer (briefed), Bauckham, Sparks, Rolfe & Thomsen, Kalamazoo, Michigan, for Amicus Curiae.
 
 
 4
 Before: BOGGS and MOORE, Circuit Judges; and DOWD,* District Judge.
 
 
 5
 BOGGS, J., delivered the opinion of the court. MOORE, J. (pp. 322-331), delivered a separate opinion concurring in the result. DOWD, D.J. (pp. 331-335), delivered a separate opinion dissenting in part and concurring in part.
 
 OPINION
 
 6
 BOGGS, Circuit Judge.
 
 
 7
 Brighton Township, Michigan, appeals from the determination, after a bench trial, that it is liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., for "response costs" incurred by the government in cleaning up a dumpsite used by the township and others. We vacate this finding of liability, and remand for further proceedings. The United States appeals the denial of prejudgment interest on its award. We vacate this denial, and remand for a determination of the proper amount of interest on any award that is made.
 
 
 8
 * A
 
 
 9
 The subject of this case is a plot of land in Brighton Township comprising roughly 15 acres. From 1960 to 1971, the property was owned by Vaughan Collett; since his death in 1971, it has been owned by his son Jack. In 1960, the township contracted with Vaughan Collett to use the site as a dump for town residents, for "waste" but not "garbage" (a distinction that was never defined). The agreement required the dump to "meet specifications of and be under the supervision of the [township's] Board of Appeals."[1] The township agreed to pay Collett $60 a month in rent and $10 a month for maintenance. Collett was supposed to be responsible for maintaining the facility, and had full salvage rights. Township residents were admitted to the dump free of charge; non-residents could use Collett's property as a dump as well, but they had to make their own fee arrangements with Collett.
 
 
 10
 The relationship between Brighton Township, Collett, and the dump changed over the years. In 1961, the township clarified that its agreement did not allow commercial or industrial waste, though as with waste from non-residents, Collett could make separate arrangements to accept it. In 1965, the township changed its mind, and decided to let local commercial waste into its dump along with residential waste. In early 1967, the board agreed to pay Collett a substantially higher fee, in exchange for limiting use of the dump to township residents only. Non-residents and industrial customers, who had previously been able to contract separately with Collett, were now excluded from using the facility. This arrangement remained until the township closed the dump in 1973.
 
 
 11
 The fee paid to Collett rose steadily. In 1963, it increased from $70 to $120, and two years later it grew again to $150. Early in 1967, the fee was raised to $175, and later in the year, when the dump was closed to all but township residents, it was set at $300. That same year, after two special (and unspecified) appropriations totaling $100 were made, the board decided to cease making such supplemental payments unless it had contracted to do so in advance. The monthly fee was raised to $400 in 1969, and $500 in 1970. In 1971, the allotment became $500 a month for rental, with an additional $666.66 a month for maintenance.
 
 
 12
 Over the years, the Township Board often made significant extra appropriations, for "dump repair" ($320), extra maintenance ($67.50; $552; $500), "additional expenses" ($58), bulldozing ($160; $649; $744), plowing for fire protection ($50), "work" ($870 to a bulldozing company; $213; $500; $500), snow removal ($50; $150; $96 for "trenching and snow removal"; $150 for "snow removal and small dozing"), and "dozers and crane work" ($350).[2] The annual appropriation made for 1968, $4200 ($300 times 12 months, plus $600), suggests that the township expected in advance that it would have to make supplemental payments. In 1969, this anticipatory excess was increased to $1400, for a total appropriation of $5000. The amount in 1969 proved to be deficient by $1561 (due in part to a hike in the monthly fee), and so a total of $12,000 was allocated for 1970. Despite the fact that less that $10,000 of this amount was spent, the board budgeted $14,000 for 1971. The final special appropriations, made upon the dump's closure in 1973, were for Jack Collett to cover up the dump ($3400), and for other unspecified rehabilitation work, the full amount ($4214) to be paid out only upon the satisfaction of the county health department and township officials.
 
 B
 
 13
 By 1965, Collett began having trouble maintaining the dump. The township declined at first to provide funds for a clean-up, but later got an estimate on "excavating and covering" some of the "old scrap" at the "Township dump." The next year, Collett asked the township to provide a bulldozer. The board discussed the dump's compliance with new state regulations "regarding the operating of a dump," and determined that after some alterations the dump would be in compliance. In August 1966, the board was still concerned with unelaborated "problems" at the dump, and delegated to a committee the job of reporting what could be done to alleviate the problems.
 
 
 14
 In May 1967, all of the board's members agreed to visit the site. After doing so, arrangements were made (by whom is not clear) for more bulldozing, which was apparently performed the next month. The board agreed to inquire about clearing away some of the accumulated debris by having the Brighton Township Junior Fire Department burn it.
 
 
 15
 Beginning in the late 1960s, the Michigan state government began regulating dumps more carefully. For Brighton Township, part of this scrutiny included visits by the county sanitarian, who was sometimes accompanied by township officials. Conditions at the dump were so bad that the township was told in May 1971 by the Michigan Department of Public Health to take "drastic measures" to improve the dump; if not, legal action would be taken to close it. The sanitarian's reports noted that the ground water was not being protected; cover placed over the refuse was inadequate; there was no compaction of refuse; no responsible director of the facility was present; fires were burning in the refuse; and the salvage operation had gotten "completely out of hand." The township supervisor was notified of most of these facts in a letter, which also noted that the site did not have the appropriate licensing under state law. In November, another letter from the Department of Public Health to the township supervisor noted that although there were no fires, and the piles of appliances and automobiles had been somewhat "straightened up," conditions were still unacceptable; the threat to close the dump was renewed. In 1972, the board discussed another stern letter from a state health officer regarding the site. The insufficiency of alternative facilities delayed the closure of the dump, but once this was remedied, the dump was shut down in 1973. The board wrote an official letter to the state health officer stating that the township had fulfilled its clean-up duties.
 
 C
 
 16
 In 1989, a federal field investigation team examined the site and determined that there were hazardous materials there, particularly around a cluster of 200 deteriorating drums. In 1990, the EPA sent a technical assessment team to follow up on the earlier examination. The team determined that the site met the criteria under the National Contingency Plan (the set of CERCLA regulations that provides criteria for action, 40 C.F.R. Part 300) for a removal action, the cost of which it estimated at over $400,000.
 
 
 17
 Through 1995, the United States had incurred $490,948.32 in response costs, exclusive of interest. The government brought suit in March 1994, against both the township and Jack Collett. It obtained a default judgment against Collett in March 1996, and Collett is not participating in this appeal. After a three-day trial in March 1996, the district court, ruling from the bench, found Collett and the township jointly and severally liable for the full amount of response costs plus postjudgment interest, but did not award any prejudgment interest. Final judgment was entered in May, and both Brighton Township and the United States filed timely notices of appeal.
 
 II
 
 18
 * The township appeals the district court's determination that it is liable for response costs. It raises four arguments. First, it argues that the Brighton Township dump comprised only three acres in the southwest corner of the fifteen-acre Collett property, and that those three acres contained no hazardous waste--therefore, the government should have defined the bounds of the site in a way that excluded the dump. Second, it contends that it did not exercise sufficient control over the site to qualify as a liable "operator" under CERCLA. Third, it claims that all of the hazardous waste at the site was contributed by non-township sources, and so the township should not be liable. Fourth, and connected to the first three arguments, it argues that the district court clearly erred when it held that the harm and costs were not divisible, and imposed joint and several liability on Brighton Township, with Collett, for the entire amount of response costs.
 
 B
 
 19
 CERCLA, at 42 U.S.C. § 9607(a)(2), establishes strict liability, covering "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." The first three issues here turn on interpretations of the words "facility," "operated," and "disposal of any hazardous substance," respectively.
 
 
 20
 Brighton Township's first argument is that the "facility" in question should not have been defined to include the township dump. In other words, the Collett property should have been separated by the EPA into two parts--the township dump in the southwest corner, and the rest of the property.[3] The township claims that it was only connected with the former, and points out that the government's primary physical clean-up was confined to a "hot zone" where the main cluster of barrels was located. This area did not involve any part of the three-acre southwestern corner, which contained no significant contamination at that time.
 
 
 21
 CERCLA defines the term "facility" at 42 U.S.C. § 9601(9)(B) as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...."[4] Our task is to determine how broadly or narrowly the bounds of the "site" may be drawn. At one extreme, the entire Collett property (or the entire county for that matter), could be defined as a facility based on the presence of a hazardous substance in one portion of it. At the other extreme, the facility could be defined with such precision as to include only those specific cubic centimeters of Collett's property where hazardous substances were deposited or eventually found. The first approach obviously would sweep too broadly, the second too narrowly.
 
 
 22
 The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination. See Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp., 847 F.Supp. 389, 395-96 (E.D.Va.1994) ("That ARC leased only a portion of the property is immaterial to defining the scope of the 'facility.' What matters for purposes of defining the scope of the facility is where the hazardous substances were 'deposited, stored, disposed of, ... or [have] otherwise come to be located.' ") (citation and emphasis omitted; alteration in original). However, an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single "facility," even if it contains parts that are non-contaminated. See, e.g., Clear Lake Props. v. Rockwell Int'l Corp., 959 F.Supp. 763, 767-68 (S.D.Tex.1997) (rejecting argument that surface structures constitute separate "facility" from subsurface soil and groundwater); cf. Northwestern Mutual, 847 F.Supp. at 396 (counting entire area as "facility," but only because each of its quadrants are contaminated). Were this not the case, the statute would have defined a facility as 'those parts of a site' with contamination. The effects of the coarseness of this definition are mitigated by the availability of divisibility (discussed in detail in Section III) and contribution.[5] See 42 U.S.C. § 9613(f).
 
 
 23
 In this case, even though township residents generally left their refuse in the southwest corner, it appears that the entire property was operated together as a dump. Nothing in the agreement between the township and Collett specified that township dumping was limited to the southwest corner (though nothing specified that it was not). Before 1967 (and perhaps illicitly after 1967 as well), Collett allowed others to dump on other parts of his property, pursuant to his agreement with the township. Most significantly, Collett often moved trash from one part of the property to another as part of his salvage operation, so that hazardous materials found in the rest of the facility might have originated in the township dump. Household appliances, the sort of object that residents discarded in the southwest corner, were moved out of the corner and across an access road, and placed in large piles. Furthermore, there was testimony that some township residents disposed of appliances in the northern part of the site, as well as testimony that barrels filled with local household trash were burned and buried with the help of a township contractor (though it is not clear if these burials were in the southwest corner, the "hot zone," or neither).
 
 
 24
 In sum, then, the facts show that (1) local household and commercial dumping was largely, but not completely, limited to the southwest corner of the property; (2) refuse was moved around on the property; and (3) Collett placed materials from non-residents and industries in other parts of the site. Collett used the entire property as a dump, and so it is appropriately classified as a single facility. If the township was only connected to the southwest corner, the appropriate place to draw that distinction is in the divisibility analysis, not in the bounding of the facility.
 
 C
 
 25
 Both parties and the district court suggest that to determine whether Brighton Township was an "operator" for CERCLA purposes, this court should use an "actual control" standard, as opposed to an "ability to control" standard. We agree, though we hold that the primary question is whether the Township's activities satisfy the ordinary meaning of the term "operation."
 
 
 26
 The question of what general level of operative control over a facility is necessary to make an entity an operator is one of first impression in this circuit. Fortunately, the Supreme Court has recently addressed the issue of defining "operator" status. United States v. Bestfoods, --- U.S. ----, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The statute's tautological definition is not very helpful; an "operator" is "any person ... operating [a covered] facility." 42 U.S.C. § 9601(20)(A)(ii);[6] see Bestfoods, --- U.S. at ----, 118 S.Ct. at 1882. The Supreme Court, faced with this problem, took the sensible approach of defining "operator" according to its ordinary meaning:
 
 
 27
 [A]n operator is simply one who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.
 
 
 28
 Id. at 1887. The Court summarized later that, "when [Congress] used the verb 'to operate,' we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." Id. at 1889; see also Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 156 (7th Cir.1988) ("The definition of 'owner or operator' ... must come from a source other than the text. The circularity strongly implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings.").
 
 
 29
 Brighton Township suggests that several other circuits have adopted an "actual control" standard. Most of these cases, however, concern questions of liability relating to corporate form and control. See, e.g., Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir.1996); United States v. USX Corp., 68 F.3d 811 (3d Cir.1995); United States v. Kayser-Roth Corp., 910 F.2d 24 (1st Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). These corporate-form cases are not directly applicable to the present case. The task of placing responsibility for an action in one or more cells of a corporate honeycomb is vastly different than evaluating (as here) the responsibility of a single entity in a vacuum, especially in the context of a strict liability statute.[7]
 
 
 30
 Nevertheless, these cases do highlight the importance of establishing some actual control by a putative operator. The plain meaning of the term "operator" as expounded upon in Bestfoods does, after all, require that Brighton Township have performed some affirmative acts--that they "operated" the site by "direct[ing] the workings," "manag[ing]," or "conduct[ing] the affairs"--before they can be held responsible.
 
 
 31
 We hold, therefore, that an "actual control" test applies not just in the corporate context, but in the present one as well. Before one can be considered an "operator" for CERCLA purposes, one must perform affirmative acts. The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator.
 
 D
 
 32
 Two cases from other circuits, each discussing operator liability outside of the corporate context, raise important issues for us to consider. In the first, Nurad Inc. v. William E. Hooper & Sons Co., 966 F.2d 837 (4th Cir.), cert. denied, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), the Fourth Circuit "decline[d] to absolve from CERCLA [ § 9607(a)(2) ] liability a hypothetical party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup." Id. at 842. Although we decline to follow the Fourth Circuit and allow the imposition of operator liability based on mere "authority to control," ibid., Nurad raises the question of the effect on liability of a failure to act.
 
 
 33
 Once affirmative acts have been found to render someone an operator, it is no defense to liability for that operator to say it was not the actor responsible for a particular hazard. To hold otherwise would allow operators to escape liability by neglecting their responsibility for proper management of their facilities, a result that would undo the strict liability scheme defined by § 9607(a).[8] To reiterate, actual control requires affirmative acts. Omissions cannot suffice to show that. After it is established that a defendant is an operator, however, a defendant is just as responsible for hazardous conditions caused by its neglect and omissions as it is for those caused by its affirmative acts.
 
 E
 
 34
 In another instructive case, FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833 (3rd Cir.1994) (en banc), the Third Circuit held that "the government [here, the federal government] can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility ... even though no private party could engage in the regulatory activities at issue." Id. at 840. Thus, a government entity, by regulating the operation of a facility actively and extensively enough, can itself become an operator. Cf. United States v. Dart Indus., 847 F.2d 144, 146 (4th Cir.1988) (declining to classify local government as operator merely for failing to regulate adequately). Our task is to distinguish (1) situations in which a governing authority uses its conventional police power to ensure that a dump does not pose a threat to public health and safety; from (2) situations in which the "regulations" are just the government's method of macromanaging the facility.[9]
 
 
 35
 Asking these questions in the case at hand, we cannot conclude that Brighton Township was or was not an operator of the facility. This inquiry is properly left to the district court, utilizing the proper standard that we have set forth today. For the purpose of responding to Judge Dowd's arguments, however, we will briefly explain why we cannot conclude as a matter of law that the Township was not an operator.
 
 
 36
 As noted by the district court, the record showed that the agreement with Collett specified that the dump "meet the specifications of and be under the supervision of the Board of Appeals." The township was not operating at arm's length with a contractor.[10] Rather, it made repeated and substantial ad hoc appropriations, and it made arrangements (including with the local Junior Fire Department) for bulldozing and other maintenance when Collett himself proved unequal to the task. It also took responsibility for ameliorating the unacceptable condition of the dump, before and after scrutiny from the state government, at least as early as 1965.[11] See Bestfoods, --- U.S. at ----, 118 S.Ct. at 1887 (defining "operator" to include entity that makes "decisions about compliance with environmental regulations").
 
 
 37
 To summarize, mere regulation does not suffice to render a government entity liable, but actual operation (or "macromanagement") does. We vacate the district court's ruling that Brighton Township was an operator of the facility, and remand for further proceedings consistent with this opinion.
 
 
 38
 While we are sympathetic to the plight of the township, which could not have been happy when this dirty problem fell into its lap, there is no basis for us to conclude that the township was somehow forced to take such direct responsibility and action. Perhaps ironically, if Brighton Township had been willing to spend more money in the 1960s and 1970s, it could have made other, arm's-length arrangements for the disposal of local refuse and the rehabilitation of Collett's property, and probably avoided operator liability.
 
 F
 
 39
 The district court held that "hazardous substances were released on the site during the relevant time period," which it defined as 1960 to 1973. After defining the facility to include the township dump, and determining that Brighton Township was an operator, this determination was the final factor required for the district court to hold Brighton Township liable under § 9607(a). Although we are vacating and remanding the decision of the district court as to operator status, we pause here to affirm these findings by the district court regarding the release of hazardous substances.
 
 
 40
 It is undisputed that Brighton Township's involvement with the dump ended when the dump closed in 1973; it is not disputed that the district court defined the relevant time period correctly. Brighton Township claims, however, that the evidence showed that the hazardous materials found at the site were either placed there after 1973, or placed there by non-residents, beyond the scope of Brighton Township's operator status.
 
 
 41
 On the latter claim, Brighton Township's argument is misplaced. If an entity is an operator, it is jointly and severally liable for any hazardous material that is found, whatever its source, unless that operator can show divisibility. This is clear from the strict-liability language of the statute, which holds liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The use of the passive voice in the second half of the clause vitiates Brighton Township's claim.
 
 
 42
 As for the question of when the hazardous waste was deposited (a distinction for which the statutory language clearly does provide), there is sufficient evidence on which to affirm the district court. The district court itself cited much of this evidence. An EPA employee with relevant experience testified that the barrels excavated from the site in 1993 appeared to be twenty to thirty years old. A local resident testified that he saw rusty drums being delivered to the property in the late 1960s; that residents used to burn their trash in empty 55-gallon barrels on the site; and that residents would dispose of their old paint cans at the site. Other local residents testified that, as youths, they saw truckloads of chemical-filled drums (some of which they saw break open) being brought into the site in the early 1960s. Finally, an EPA chemist testified that pollutant chemicals found at the site were consistent with paint formulations used in the 1960s.
 
 
 43
 Brighton Township cites other evidence in the record. First, a county officer testified that he did not see the main group of 55-gallon drums when he inspected the site in 1973, and that it was his job to look for and report such things. Another state officer testified that he did not see any such group of drums during his visit, but he admitted that his search was cursory, and that he would not have seen anything that was hidden by brush or was buried. A third officer, otherwise relied on by Brighton Township, testified that he would not have seen any drums during his inspection if they were buried.
 
 
 44
 There is also the reasonable inference to be made that it is much more likely that Collett brought in the hazardous waste before 1973, when there was little or no scrutiny of the area, than after, when the dump was closed and officials monitored the area for hazardous waste more thoroughly. Altogether, there is enough evidence that hazardous materials were brought into the site before 1973 to support the district court's determination of liability under § 9607, if the Township is held to be an operator.
 
 III
 
 45
 The district court decided that the harm was not divisible, saying only that Brighton Township did not sustain its burden of proof, and stating the test as "whether there is a reasonable basis to conclude that the harm is divisible and whether the harm is capable of being divided."
 
 
 46
 * We have interpreted CERCLA "to impose joint and several liability when the environmental harm is indivisible, and to allow for apportionment when two or more persons independently are responsible for a single harm that is divisible." United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507 (6th Cir.1989) (citation omitted) (citing United States v. Monsanto, 858 F.2d 160, 171-73 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989)), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).[12] We affirm the district court's determination of indivisibility unless it is clearly erroneous. Meyer, 889 F.2d at 1507.[13] The burden of proof is Brighton Township's. Id. at 1508.
 
 
 47
 We look first to § 433A of the RESTATEMENT (SECOND) OF TORTS (1965), for the "traditional and evolving principles of common law" that we use to determine divisibility. Meyer, 889 F.2d at 1507; see also Damon v. Sun Co., 87 F.3d 1467, 1476 (1st Cir.1996); In re Bell Petroleum Servs., Inc., 3 F.3d 889, 895 (5th Cir.1993); United States v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir.1993); United States v. Alcan Aluminum Corp., 964 F.2d 252, 268 (3d Cir.1992); Monsanto, 858 F.2d at 172.
 
 
 48
 The Restatement says that "[d]amages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." RESTATEMENT (SECOND) OF TORTS § 433A. Although most courts have looked to the Restatement to at least some degree, there is no consensus as to what constitutes "a reasonable basis." The Restatement itself offers the example of factories polluting a stream, with damages apportioned based on the respective volume of pollutants that each disgorges. Id. at cmt. d.
 
 B
 
 49
 As the Second Circuit has "candidly admit[ted]," Alcan, 990 F.2d at 722, this divisibility analysis weakens the strict liability nature of CERCLA. This is because defendants who can show that the harm is divisible, and that they are not responsible for any of the harm, have effectively fixed their own share of the damages at zero. No causation means no liability, despite § 9607(a)' § strict liability scheme.[14]
 
 
 50
 We agree also with the Fourth and Fifth Circuits, and reject a more expansive approach to divisibility analysis that would erode strict liability even further. See Bell, 3 F.3d at 901; Monsanto, 858 F.2d at 171 n. 22. That approach, epitomized by United States v. A & F Materials Co., 578 F.Supp. 1249 (S.D.Ill.1984), incorporates into divisibility the broad equitable bases of apportionment found in the contribution analysis of § 9613(f), notably the "Gore factors":[15]
 
 
 51
 (i) the ability of the parties to demonstrate that their contribution to a discharge[,] release or disposal of a hazardous waste can be distinguished;
 
 
 52
 (ii) the amount of the hazardous waste involved;
 
 
 53
 (iii) the degree of toxicity of the hazardous waste involved;
 
 
 54
 (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
 
 
 55
 (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
 
 
 56
 (vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.
 
 
 57
 Id. at 1256. Although we know that we cannot define for all time what is a reasonable basis for divisibility and what is not, we do take this opportunity to reject fairness-based approaches in favor of the more precise and less normative Restatement approach, which concentrates solely on causation.[16] We distinguish the divisibility defense to joint and several liability from the equitable allocation principles available to defendants under CERCLA's contribution provision. The former is legal, the latter equitable; the respective tests used to execute them should reflect this distinction.
 
 
 58
 Finally, we note that this analysis should not be influenced by Michigan's comparative negligence framework, which is based on notions of fault rather than causation, and which begins with the presumption that liability must be apportioned. The standard to be applied here is one of federal common law, not Michigan state law. See Monsanto, 858 F.2d at 171. Unlike comparative negligence, divisibility analysis is not an invitation to courts to attempt to 'split the difference.' If they are in doubt, district courts should not settle on a compromise amount that they think best approximates the relative responsibility of the parties. Rather, if they are in doubt, they should impose joint and several liability. Only if they have a reasonable basis for dividing causation should they actually apportion the damages.
 
 
 59
 To summarize, a defendant can avoid joint and several liability if it can prove divisibility in the district court, and we review the district court's determination for clear error. The proper standards for divisibility come from the Restatement (Second) of Torts, which seeks a reasonable basis for determining the contribution of each cause to a single harm. We do not attempt an exhaustive list of bases for apportioning causation, but we do note that we accept only bases that apportion causation, not those that seek to apportion blame in a normative manner. Finally, we reiterate that divisibility is appropriate only in those cases where causation is apportionable on a reasonable basis.
 
 C
 
 60
 Turning back to the facts in Brighton Township's case, we conclude that a remand is necessary on this issue. Our examination of the record provides some basis for a finding of divisibility. Even if we had affirmed with regard to liability, therefore, we would not be able to conclude that the district court's "error" (providing no explanation for its analysis, and so presumptively applying an incorrect standard, given our extensive clarification of divisibility today) was harmless. Although we find Brighton Township's proposed bases for apportionment to be only somewhat convincing, the district court, upon reviewing its fuller record and applying the principles we assert above, may reach different conclusions.
 
 
 61
 Brighton Township offers two bases for divisible apportionment. First, it argues that it was responsible only for the wastes present in the southwest corner of the dump. Since the removal action did not include this part of the facility, the township argues, divisibility along this line would result in no liability for the township. As discussed above, however, local residents placed waste outside the southwest corner on occasion; the Colletts moved waste throughout the facility; there was nothing in the contract that limited local dumping to the southwest corner. Most importantly, Brighton Township did not show that its maintenance activities were confined to the southwest corner. Therefore, the geographic limitation alone is probably not an acceptable basis for apportionment, since it does not necessarily remove the township as a possible causal agent of the hazardous deposits.
 
 
 62
 Second, Brighton Township argues for a volumetric basis of apportionment, because the hazardous waste in 55-gallon drums in the hot zone was from industrial and non-local sources. Although some of the hazardous waste apparently came from paint and batteries, which could have been from local sources, the record supports a conclusion that much or most of the hazardous waste was industrial. As such, it probably came from side deals between Collett and industrial and non-local sources before 1967. Because there is reason to conclude that the township took an active role in maintaining the site at least as early as 1965, however, this volumetric apportionment may nevertheless be inappropriate as well. However, we leave this determination for the district court.
 
 
 63
 Judge Moore's opinion contends that, because operator liability has two components--(1) being an operator (2) when there is a release of hazardous material--that the only possible basis for divisibility is temporal. Op. at 330-31. That is, if Brighton Township can show that it was only an operator after a particular year, and that only a certain percentage of the hazardous material was introduced into the property after that year, it can show divisibility and be held liable only for the releases occurring after it became an operator. Judge Moore is correct that the distinction between operator liability and other forms of liability is very important to consider when determining divisibility. Furthermore, time seems the most obvious and probable way that an operator can show divisibility. However, it is not the only one.
 
 
 64
 As an example, if Brighton Township could show (as it tried to do here) that its "operating" activities were completely limited to a discrete and measurable section of the property, and that the releases onto or from that section represented a discrete and measurable harm, this would provide a reasonable basis for apportionment.
 
 
 65
 That Judge Moore's limitation of divisibility to the "root" of the liability is misplaced can be seen from a single example: the suggested use by the Third Circuit of bases like "relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous substances" for arrangers' liability. United States v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir.1993). These can be reasonable bases for dividing harm (even between two contemporaneous operators, if their operating responsibilities are sufficiently distinguishable), even though the statute says nothing about "relative toxicity" in announcing that arrangers are generally liable. See 42 U.S.C. § 9607(a)(3). Divisibility seeks to apportion liability based on relative contribution to harm, if such is reasonably ascertainable. That this may import additional considerations that are not present at the initial stage, when liability is imposed jointly and severally, should come as no surprise. See Alcan, 990 F.2d at 722 ("[W]e candidly admit that causation is being brought back into the case[.]"). Of course, as a practical matter, such complicated multi-factor analyses will provide reasonable bases for divisibility primarily when they are used to show that a defendant is not responsible for any harm at all. See ibid.
 
 
 66
 We therefore remand to the district court for an examination of possible bases of divisibility, consistent with the guidelines we have set forth. The district court should be receptive to any argument for divisibility that provides a reasonable basis--sounding in causation, not equity or normative fault--for distinguishing between that harm caused by Brighton Township and that harm caused by others.
 
 IV
 
 67
 The United States cross-appealed against Brighton Township and Collett on the failure of the district court to award prejudgment interest, which the United States argues is mandatory. Ruling from the bench, the district court said that it would not grant any prejudgment interest, but gave no explanation for that holding.
 
 
 68
 As a preliminary matter, we must determine the standard of review. We have generally used the abuse of discretion standard in those instances where an award of prejudgment interest is discretionary, see, e.g., Anderson v. Whittaker Corp., 894 F.2d 804, 809 (6th Cir.1990). If such an award is mandatory under CERCLA, however, an unexplained failure to make such an award is an abuse of discretion per se. Furthermore, the determination of whether CERCLA mandates, or merely allows, prejudgment interest is a question of law, which we review de novo. United States v. Baro, 15 F.3d 563, 566 (6th Cir.), cert. denied, 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994).
 
 
 69
 Awards of prejudgment interest are provided for by 42 U.S.C. § 9607(a), which states: "The amounts recoverable in an action under this section [which states that certain persons "shall be liable for" certain costs] shall include interest.... Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." (emphasis added). Based on this language, we conclude that prejudgment interest is mandatory when § 9607 damages are awarded. See Bancamerica Commercial Corp. v. Mosher Steel, 100 F.3d 792, 802 (10th Cir.1996) (mandating prejudgment interest awards under § 9607), amended by 103 F.3d 80 (10th Cir.1996); Meyer, 889 F.2d 1497, 1505-06 (6th Cir.1989) (quoting mandatory language in Superfund Amendments and Reauthorization Act (SARA) legislative history at 1986 U.S.C.C.A.N. 2835, 2855 ("The section gives the Administrator authority to obtain prejudgment interest in all cost recovery actions.")).
 
 
 70
 Brighton Township suggests that it was proper for the court to refuse to award prejudgment interest in this case, because the United States did not provide the district court with any data with regard to interest rates or methods of calculation. It cites the Tenth Circuit's decision in Bancamerica for the proposition that this constitutes fatal neglect by the United States:
 
 
 71
 [I]t is appropriate to require those requesting prejudgment interest to provide the court with proper calculations setting forth the interest they seek. However, we also agree with Bancamerica and ASARCO that, because interest determinations are compounded calculations, it may be impossible for parties to provide accurate calculations prior to the court's allocation of response cost liability. In such instances, parties may submit their interest calculations to the court subsequent to that finding.
 
 
 72
 Bancamerica, 100 F.3d at 802. The Bancamerica court noted, however, that a district court abuses its discretion when it refuses to grant prejudgment interest merely because of the plaintiff's failure to provide an interest rate or a method of calculation. The appeals court noted that the interest rate is prescribed by the statute, see 42 U.S.C. § 9607(a), and that generally acceptable accounting principles should be used to calculate the total. Bancamerica, 100 F.3d at 802. We agree.
 
 
 73
 In this case, the United States did not submit any calculations to the district court to accompany its request for prejudgment interest, nor did it do so "subsequent to [the] finding" of liability in the form of a motion for reconsideration. Neither, however, did the district court request any assistance in calculating the interest, and, as the Tenth Circuit noted in Bancamerica, the interest rate is mandated in the statute. The only information that the district court needed from the parties was the starting date for calculation, "the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a).
 
 
 74
 The United States claims, without refutation, that it issued a demand letter in July 1993 (Cross-Appellant's Reply Brief at 2). Brighton Township notes that the removal action ended in November 1990 (Appellant's Brief at 8). The court awarded damages, thus recognizing the precise amount spent by the government. There was, therefore, an adequate basis for the district court to calculate prejudgment interest. To the extent that the United States did not provide sufficient data for a precise calculation, the district court simply should have erred on the side of a lower amount. It should not have responded by settling on the very precise (but wholly inaccurate) figure of zero. Therefore, we remand to the district court for a calculation and award of prejudgment interest to the United States, if the district court imposes liability on Brighton Township.V
 
 
 75
 For the foregoing reasons, we VACATE the district court's decision, and REMAND for further proceedings consistent with this opinion, to determine if Brighton Township is an "operator," and, if it is held to be, to determine whether the liability is divisible, and to calculate and award appropriate prejudgment interest.
 
 CONCURRENCE IN RESULT
 
 76
 MOORE, Circuit Judge, concurring in the result.
 
 
 77
 At issue in this appeal is whether Brighton Township is jointly and severally liable for response costs incurred by the United States in the clean-up of a dump site used by the Township and its residents. For the reasons expressed below I believe that the entire dump site constitutes a single facility under CERCLA. I also believe that we must remand for further proceedings on the issue of whether the Township is a previous operator of the facility, and I outline some relevant factors for determination of this issue. Moreover, because I am not in full agreement with Judge Boggs's characterization of the divisibility defense, I write separately in order to express my views on the matter.
 
 
 78
 I. The Definition of "Facility"
 
 
 79
 CERCLA imposes strict liability upon a previous owner or operator of a "facility" at the time at which hazardous substances were disposed of. 42 U.S.C. § 9607(a)(2). Before addressing whether the Township's actions rendered it an "operator" under CERCLA, we must first identify the boundaries of the "facility" at issue in this case. The Township asks us to define as a "facility" only the contaminated portion of a site or area requiring clean-up. Because the three-acre southwest corner of the Collett property where the Township deposited its waste contained no significant contamination, under the Township's definition, the facility in question would encompass not the entire Collett property, including the southwest corner, but only the "hot zone" where the hazardous barrels were located. I agree with Judge Boggs, however, that the entire Collett property should be classified as a single facility, although I write separately to express an alternative basis for this conclusion.
 
 
 80
 CERCLA defines the term "facility" as "(A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9) (emphasis added). As indicated by the term "or" separating part A from part B, an area which qualifies as one of the entities set forth in part A need not satisfy the condition set forth in part B. Because the entire Collett property operated as a landfill, and as such qualifies as a single facility under CERCLA, Judge Boggs needlessly focuses on part B of the statutory definition of the term "facility" and therefore on how broadly or narrowly to draw the boundaries of a site containing hazardous substances.
 
 
 81
 A "landfill" is "a low area of land that is built up from deposits of solid refuse in layers covered by soil." RANDOM HOUSE UNABRIDGED DICTIONARY 1079 (2d ed.1993). The boundaries of a "landfill" comprising a "facility" under CERCLA should be defined not by the bounds of the contamination, but by the bounds of the property operating as a landfill. Because parts A and B of the statutory definition of the term "facility" are set apart from one another by the word "or" rather than "and," the two provisions set forth separate and independent definitions of the term "facility." In other words, an area fulfilling the requirements of part A need not also meet the requirements of part B to be considered a "facility," and vice versa. Consequently, part B should not be read as in any way modifying part A. The specific bounds of contamination are thus irrelevant to the task of defining the boundaries of any property comprising a "facility" under part A. All contiguous land operating as a landfill constitutes a facility under CERCLA, regardless of whether hazardous substances occupy the entire site.
 
 
 82
 As Judge Boggs explains, the testimony produced at trial supports the determination that the entire property operated together as a dump site, or landfill. Lloyd Roten testified that the southwestern corner operated as a dump for Township garbage, and that Vaughn Collett covered with dirt the waste deposited in that portion of the property. J.A. at 146. Roten also testified that appliances were deposited on the northwest side of the property. J.A. at 161. The testimony of Marvin Roten and Dell Smith also placed refuse throughout the site. Roten testified that during the 1960s he observed drums of paint waste thinners in the mid-western side of the property, which was covered over with dirt, J.A. at 177-78, and on occasion drums of waste were buried with household trash from the Township. J.A. at 190. He also testified that Vaughn Collett moved waste around from one area of the property to another, J.A. at 194, and "buried everything." J.A. at 180. Smith observed drums and appliances disposed of and buried on the north side of the property. J.A. at 167, 169, 173. Moreover, Smith stated that Vaughn Collett would bury the unburned trash located on his property. J.A. 171. The Township itself states in its brief that Vaughn Collett covered the Township's refuse with soil, as well as burying empty 55-gallon drums with the trash. Appellant's Br. at 11. The Collett property clearly operated as a single landfill, and is therefore a "facility" under CERCLA.[1] See City of N. Miami, Fla. v. Berger, 828 F.Supp. 401, 407 (E.D.Va.1993) (site is a "landfill" and therefore a "facility" under CERCLA); Rhodes v. County of Darlington, S.C., 833 F.Supp. 1163, 1177-78 (D.S.C.1992) ("[A] landfill is the very epitome of a 'waste disposal facility.' ").
 
 
 83
 Since the dump is a landfill, it is a "facility" under CERCLA, and it is unnecessary to determine the bounds of the "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located," 42 U.S.C. § 9601(9)(B). I do not disagree, however, with Judge Boggs's conclusion that the entire area should be considered a facility under § 9601(9)(B).
 
 
 84
 II. Definition of the Term "Operator"
 
 
 85
 CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for ... all costs of removal or remedial action incurred by the United States Government." 42 U.S.C. § 9607(a)(2). Because the statutory definition of the term "person" encompasses not only private entities but also the "United States Government, [a] State, municipality, commission, political subdivision of a State, or any interstate body," 42 U.S.C. § 9601(21), a township such as Brighton Township may be held liable under § 9607(a)(2).[2] A governmental entity responsible in part for the release or threatened release of a hazardous substance from a facility "shall be subject to the provisions of [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607." 42 U.S.C. § 9601(20)(D).[3] In other words, states and local governments that are owners or operators of a hazardous waste facility "are to be treated in exactly the same manner as nongovernmental owner/operators" absent an express provision to the contrary. Thiokol Corp. v. Department of Treasury, State of Mich., Revenue Div., 987 F.2d 376, 382 (6th Cir.1993). Although we must treat governmental and nongovernmental owners and operators alike for purposes of liability, the statute is silent with respect to whether the same threshold of control over a facility renders both a governmental entity and a nongovernmental entity an operator.[4] Policy concerns caution against consideration of the same factors in the same manner where the nongovernmental entity's conduct occurs within the regulatory context. But see FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833, 843 (3d Cir.1994) (en banc) (noting that the government is in the same position "as any nongovernmental entity," and then proceeding to rely on factors considered by a court deciding whether a parent could be liable as an operator for the activities of its subsidiary).
 
 
 86
 Unlike private persons, states and their political subdivisions possess and exercise regulatory power in their capacity as guardians of the public health, safety, and welfare. Governmental entities increasingly are exercising their regulatory power in an effort to address the environmental problems created by the release of hazardous materials. See Janeen Olsen, Comment, Defining the Boundaries of State Liability Under CERCLA Section 107(a), 2 VILL. ENVTL. L.J. 183, 186 (1991). Given the serious threat to public welfare posed by environmental hazards, courts should take care not to inhibit unduly the regulatory activities of states and their political subdivisions in the environmental arena. Consequently, when determining whether a governmental entity is an operator under CERCLA, we must take into consideration the possibility that "widespread state liability may have a chilling effect on long-term remedial efforts, since states may be unwilling to act when CERCLA liability is sure to be imposed." Id. at 204.
 
 
 87
 At the same time, however, we cannot ignore that the legislative history of CERCLA makes clear that "Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir.1986) (quotation omitted); see also FMC, 29 F.3d at 840. In including governmental entities among those "persons" potentially liable as responsible persons while failing to provide an exception for regulatory activity, Congress intended that a governmental entity acting in its regulatory capacity should be held responsible for cleanup costs where it operates a hazardous waste facility. See FMC, 29 F.3d at 840-41. Thus, our task of identifying when a governmental entity becomes an operator requires us to balance carefully CERCLA's broad remedial purpose against concerns of deterring state involvement in regulating hazardous waste management and clean-up.
 
 
 88
 I agree with both Judge Boggs and Judge Dowd that the governmental entity becomes an operator under CERCLA where it not only possesses the authority to control the facility in question, but also exercises "actual control." Broadly speaking, any governmental entity has the "authority" to exert control over a facility by virtue of its regulatory powers. See Kim E. Williamson and Thomas W. McCann, After Union Gas II: The State as an "Operator" Under CERCLA, 23 ARIZ. ST. L.J. 409, 443 (1991) ("If the issue is cast in terms of 'ability to control' ..., then there may be some merit in concluding that the state always should be liable because states have the inherent power and ability to control disposal of hazardous substances within their boundaries and prevent or abate environmental damage."). Thus, requiring only the "authority to control" could lead to the rather sweeping result that all governmental entities are "operators" over hazardous waste facilities located within their jurisdiction. See id. ("If mere ability to control were the test, then the Federal[, state and local] government[s] would likewise be subject to liability for every release at every facility."). In contrast, the "actual control" standard requires at least some affirmative conduct on the part of the governmental entity. Moreover, the Supreme Court recently explained that "an operator must manage, direct, or conduct operations specifically related to pollution," United States v. Bestfoods, --- U.S. ----, 118 S.Ct. 1876, 1887, 141 L.Ed.2d 43 (1998), which Judge Boggs correctly points out requires some affirmative acts. I therefore conclude that we should apply the "actual control" standard when determining whether a governmental entity is an operator under CERCLA. I also agree with Judge Boggs that a governmental entity that exercises control over a facility through affirmative acts may subsequently create or advance the hazardous contamination through its omissions as well as its affirmative conduct. A governmental entity that asserts control over the operations of a facility should not be allowed to escape liability where its subsequent neglect causes harm.
 
 
 89
 While I agree with my colleagues that we should apply the "actual control" standard in determining whether to hold Brighton Township liable as an operator under CERCLA, I believe that Judge Boggs fails to define this standard clearly so as to provide the lower courts with direct guidance as to when a governmental entity engages in regulatory activities extensive enough to make it an operator of the facility in question. Moreover, I differ with Judge Dowd over the factors sufficient to demonstrate actual control.[5]
 
 
 90
 A governmental entity exercises actual control over a facility where its involvement extends beyond "mere regulation" and amounts to "substantial control," or "active involvement in the activities" at the facility. FMC, 29 F.3d at 843 (quotation omitted); see also United States v. Vertac Chem. Corp., 46 F.3d 803, 808 (8th Cir.), cert. denied, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995). Under the Court's decision in Bestfoods, these activities must "specifically [be] related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Bestfoods, U.S. at ----, 118 S.Ct. at 1887. This standard "requires a fact-intensive inquiry and consideration of the totality of circumstances." See Vertac, 46 F.3d at 808; see also United States v. New Castle County, 727 F.Supp. 854, 864-70 (D.Del.1989); Olsen, supra, at 203. Courts seeking to determine whether a government entity maintained "substantial control" over a facility generally look at whether the state exercised "considerable day-to-day control," Vertac, 46 F.3d at 809 (quoting FMC, 29 F.3d at 844); Washington v. United States, 930 F.Supp. 474, 485 (W.D.Wash.1996), or "hands on" control, United States v. Dart Indus., Inc., 847 F.2d 144, 146 (4th Cir.1988). Unfortunately, courts differ as to what circumstances amount to day-to-day control.
 
 
 91
 The New Castle decision requires far-reaching involvement in a hazardous waste facility before imposing liability upon a governmental entity, essentially equating substantial control with maintaining "proprietary or financial interests," or "commercial interests," in the facility. New Castle, 727 F.Supp. at 866-67. Under this approach, a governmental entity will be charged with CERCLA liability only if it "profited in a commercial sense [from its involvement], as opposed to a general societal health sense." Id. at 865. The New Castle approach severely undermines CERCLA's remedial purpose by limiting the imposition of liability on governmental entities to those rare cases where they seek a profit, thereby excluding the more common scenario of extensive government involvement pursuant to its regulatory powers. See Williamson and McCann, supra, at 439 ("[M]ost if not all states and other governmental entities that become involved in hazardous waste activities do so for what might be termed societal reasons, not for commercial purposes."). This approach essentially creates a regulatory exception to CERCLA liability under § 9607(a), even though the enumerated defenses to § 9607(a) do not include a regulatory exception. See 42 U.S.C. § 9607(b). The regulatory exception is inconsistent with CERCLA's remedial goal of holding responsible persons, including governmental entities, liable for hazardous waste cleanup costs, even where such liability arises from regulatory conduct. See FMC, 29 F.3d at 839-842 (refusing to create a regulatory exception shielding the government from liability where it acts in a regulatory capacity); United States v. Iron Mountain Mines, Inc., 881 F.Supp. 1432, 1448 (E.D.Cal.1995) ("[T]here is no 'regulatory' or 'remedial' exception to CERCLA liability. Where a governmental entity's 'regulatory' or 'remedial' activities, of whatever nature, bring the entity within the definition of the terms 'owner,' 'operator,' 'arranger,' or 'transporter,' as those terms are applied to private parties, the government will be liable."); cf. Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 678 (4th Cir.1995) (refusing to exclude publicly owned treatment works from the definition of "facility" because Congress did not explicitly exclude from the definition of "owner or operator" state and local governments with one narrow exception), cert. denied, 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). Accordingly, I believe the New Castle approach places an undue burden on those seeking to hold governmental entities liable as operators under CERCLA.
 
 
 92
 The Fourth Circuit's approach in Dart provides governmental entities with less protection against the imposition of CERCLA liability than the New Castle decision. Narrowly conceiving "hands on" control to mean involvement in the particulars of day-to-day operations, the court refused to hold the state of South Carolina liable as an operator under CERCLA where it did not directly manage the employees or finances of the facility in question. See id. at 146. Judge Dowd similarly embraces this circumscribed conception of what it means to exert day-to-day control, stating that "[t]he criteria for finding such a high level of control over day-to-day operations include hiring and supervising the employees, and the control of the financial decisions of the facility."[6] I cannot agree to this limited notion of what it means to exercise "actual control" because I believe this approach frustrates CERCLA's remedial purpose by shielding from liability governmental entities responsible for harmful contamination through their exercise of significant control over hazardous facilities' pollution operations.
 
 
 93
 A governmental entity may maintain a significant degree of control over a facility's treatment of hazardous waste without "hands on" involvement in a facility's activities. Courts therefore should employ a broad conceptualization as to when a governmental entity exerts considerable day-to-day control over a hazardous waste facility's operations in order to strike the appropriate balance between CERCLA's remedial purpose and concerns over chilling regulatory efforts in the hazardous waste arena. Courts utilizing a broader notion of what it means to exercise "day-to-day control" define "actual control" to encompass not only the micromanaging of a facility's pollution activities, but also macromanaging a facility's operations.[7] Cf. Bestfoods, --- U.S. at ----, 118 S.Ct. at 1887 ("[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility."). A court's analysis of whether a governmental entity exercised "actual control" over a facility's hazardous waste activities should consider the following factors: the government's expertise and knowledge of the environmental dangers posed by hazardous waste, establishment and design of the facility, participation in the opening and closing of a facility, hiring or supervising employees involved in activities related to pollution, determination of the facility's operational plan, monitoring of and control over hazardous waste disposal, and public declarations of responsibility over the facility and/or its hazardous waste disposal. See United States v. Stringfellow, 20 Envtl. L. Rep. 20656, 20658 (C.D.Cal. January 9, 1990) (citing Rockwell Int'l Corp. v. IU Int'l Corp., 702 F.Supp. 1384, 1390-91 (N.D.Ill.1988)). None of these factors alone is necessarily sufficient to render a governmental entity an operator of the facility in question; nor is this list exhaustive. District courts should weigh these factors, as well as any other factors indicative of actual control over a facility's hazardous waste operations, to determine whether the regulatory activities of a governmental entity went beyond mere regulation and amounted to macromanagement of the facility in question.
 
 
 94
 Because the district court below did not have a clear standard guiding its application of the "actual control" test, I would remand this issue to the district court so that it may reconsider whether the totality of the circumstances demonstrate that Brighton Township's activities in relation to the dump site involved actual control over the facility such that the Township should be considered an operator under CERCLA. Thus, although I concur in the conclusion expressed by Judge Boggs that it is appropriate to remand to the district court to determine whether the Township is an operator, I believe that the district court should be guided on remand by the foregoing discussion of considerations.
 
 III. Divisibility
 
 95
 Where a defendant is liable for response costs as a responsible party under § 9607(a), the courts impose joint and several liability unless the defendant demonstrates that the harm is divisible. See United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507 (6th Cir.1989), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). To understand how the divisibility defense to joint and several liability operates in practice, I believe it helpful to consider the specific circumstances that give rise to liability in the first place.
 
 
 96
 A person who "arranged for disposal or treatment ... of hazardous substances owned or possessed by such person ... at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for" response costs. 42 U.S.C. § 9607(a)(3)-(4).[8] Although not the epitome of clear legislative drafting, several of our sister circuits nevertheless have held that this provision "does not, on its face, require the plaintiff to prove that the generator's hazardous substances themselves caused the release or caused the incurrence of response costs; rather, it requires the plaintiff to prove that [a ] release or threatened release caused the incurrence of response costs, and that the defendant is a generator of hazardous substances at the facility." United States v. Alcan Alum. Corp., 964 F.2d 252, 264 (3d Cir.1992) (emphasis added) (hereinafter "Alcan-Butler "); see also Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 670 n. 8 (5th Cir.1989); United States v. Alcan Alum. Corp., 990 F.2d 711, 721 (2d Cir.1993); United States v. Monsanto Co., 858 F.2d 160, 169 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Moreover, "including a causation requirement makes superfluous the affirmative defenses provided in § 9607(b), each of which carves out from liability an exception based on causation." New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir.1985); see also Alcan Alum., 990 F.2d at 721 (quoting Shore Realty ); Monsanto, 858 F.2d at 169-70 (agreeing with Shore Realty ). Finally, the legislative history supports the absence of a causation requirement, as the final version of the bill ultimately passed by Congress deleted the requirement that liability be imposed only on those who "caused or contributed to the release or threatened release" contained in the earlier version passed by the House of Representatives. H.R. 7020, 96th Cong. § 3071(a)(1)(D), 126 CONG. REC. 26,779 (1980).[9]
 
 
 97
 In the absence of a proximate causation requirement, CERCLA imposes liability on a generator of hazardous waste at a particular facility even though that generator's acts may not directly have caused or contributed to the contamination, see United States EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.), 3 F.3d 889, 897 (5th Cir.1993), or even where their waste may have comprised only a small portion of the waste present at the site, see Frank Prager, Apportioning Liability for Cleanup Costs under CERCLA, 6 STAN. ENVTL. L.J. 198, 198 (1987); see also Alcan-Butler, 964 F.2d at 267 ("CERCLA seemingly would impose liability on every generator of hazardous waste, although that generator could not, on its own, have caused any environmental harm."). Under joint and several liability, a generator playing only a minor causal role in the contamination of a hazardous waste facility could find itself responsible for the entire cost of cleaning-up the site. To avoid this harsh result, courts have incorporated common law principles into CERCLA's statutory framework.
 
 
 98
 Although earlier versions of both the House and Senate bills contained provisions imposing joint and several liability, see H.R. 85, 96th Cong. § 104(a), 126 CONG. REC. 23,568 (1980); S. 1480, 96th Cong. § 4(a), 126 CONG. REC. 30,908 (1980), the final version of CERCLA did not specifically provide for joint and several liability in cases involving multiple defendants. Courts, however, have not viewed Congress's deletion of a requirement of joint and several liability as an outright rejection of joint and several liability. Rather, as explained in United States v. Chem-Dyne Corp., 572 F.Supp. 802 (S.D.Ohio 1983), Congress intended for courts to determine the scope of liability under federal common law principles. See id. at 808; see also O'Neil v. Picillo, 883 F.2d 176, 178 (1st Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); Monsanto, 858 F.2d at 171 n. 23. We hold a responsible person jointly and severally liable for response costs where the harm is indivisible, but "allow for apportionment where two or more persons independently are responsible for a single harm that is divisible." Meyer, 889 F.2d at 1507. Where there is a reasonable basis for the apportionment according to the contribution of each responsible person to a single harm, each is held liable only for the portion of harm he causes. See Monsanto, 858 F.2d at 171; see also In re Bell Petroleum, 3 F.3d at 897-902; Alcan Alum., 990 F.2d at 722; Alcan-Butler, 964 F.2d at 268-269. The responsible person bears the burden of proving that the harm is divisible. See Alcan Alum., 990 F.2d at 722. Thus, in cases involving multiple generators, a generator can avoid joint and several liability where it shows a divisible harm and breaks the causal connection between the disposal of its hazardous waste and a portion of the harm.[10]
 
 
 99
 Courts recognized a divisibility defense in order to temper the harshness of unlimited liability where a generator's hazardous waste did not proximately cause the contamination, or caused only a small portion of the harm. Because Brighton Township potentially may be held liable under CERCLA as an operator of a hazardous waste facility, the question arises whether the Township can assert a divisibility defense in its role as an operator. I believe the courts should allow an operator to show divisibility of harm, but I am not in full agreement with how Judge Boggs characterizes the application of this defense where the responsible party is an operator.
 
 
 100
 In addition to holding liable a generator of hazardous waste, CERCLA holds liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. § 9607(a)(2). The statute on its face does not require the plaintiff to show that the hazardous substances disposed of at the time the defendant owned or operated the facility proximately caused the incurrence of response costs; rather, a previous owner or operator is liable where it owned or operated a facility at a time when hazardous substances were disposed of at the facility, and there was a release or threatened release of a hazardous substance that caused the incurrence of response costs. The plaintiff need not prove that the hazardous wastes disposed of at the time the defendant owned or operated the facility themselves caused the release or incurrence of response costs, but only that "a" release or threatened release caused the incurrence of response costs. As in the case of generators, harsh consequences for previous owners and operators may flow from CERCLA's strict liability scheme. Previous owners or operators may find themselves liable where the hazardous substances disposed of at the time they owned or operated the facility in question did not directly cause or contribute to the contamination or comprised only a small portion of the waste present at the site. To avoid this harsh result, once again we should allow for the apportionment of harm where the previous owner or operator provides a reasonable basis for divisibility. I turn now to a discussion of what constitutes a reasonable basis for apportioning harm.
 
 
 101
 The "act" which renders previous owners or operators "responsible" for the contamination is not their involvement in the disposal of hazardous waste, but simply their ownership or operation of the facility at the time of the disposal. See 42 U.S.C. § 9607(a)(2); see also Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 846 (4th Cir.), cert. denied, 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). Judge Boggs correctly notes that when considering a previous owner or operator's basis for apportionment, "we accept only bases that apportion causation, not those that seek to apportion blame in a normative manner." Maj. op. at 319. As a strict liability scheme, CERCLA's "focus is on responsibility, not culpability."[11] United States v. Mexico Feed and Seed Co., 980 F.2d 478, 484 (8th Cir.1992). Any introduction of a fault analysis into the inquiry, with a focus on the actor's "state of mind" or "culpability," rather than "responsibility," would severely compromise CERCLA's carefully crafted remedial scheme. As explained by Representative Florio, a sponsor of the CERCLA bill in the House of Representatives, Congress's strict liability scheme "creates a strong incentive both for prevention of releases and voluntary cleanup of releases by responsible parties." 126 CONG. REC. 26,338 (1980). If an owner or operator could insulate itself from liability where it had no knowledge or involvement in the disposal of hazardous waste on its property, the owner or operator, once aware of the contamination or threat of contamination, could avoid liability "simply by standing idle while an environmental hazard festers on his property ... so long as he transfers the property before any response costs are incurred." Nurad, 966 F.2d at 845. We therefore will not allow a previous operator to escape liability where it lacked knowledge of or involvement in the disposal of hazardous substances at its facility at the time of its ownership or operation of the facility.
 
 
 102
 Where a previous owner or operator asserts a divisibility defense to joint and several liability, apportionment is appropriate only where the previous owner or operator presents sufficient evidence from which the court can determine the portion of harm caused by the hazardous substances disposed of at the time of its ownership or operation of the facility, as distinguished from the portion of harm caused by hazardous waste amassed on the property at a time when the defendant was not the owner or operator of the facility. See In re Bell Petroleum Servs., 3 F.3d at 902-904 (holding that there was a reasonable basis for apportioning liability among former owners where only a portion of harm was caused by hazardous waste disposed of at the time the defendant owned the facility). Restricting the divisibility defense to this narrow circumstance limits the analysis to the causal connection between the incurrence of response costs and the defendant's "act" which gave rise to its responsibility for response costs--the defendant's ownership or operation of the facility in question "at the time of disposal of any hazardous substance"--without shifting the focus away from responsibility to culpability. Moreover, this approach ameliorates the harshness of CERCLA's liability scheme without frustrating CERCLA's remedial purpose. Because previous owners and operators cannot escape liability for response costs proximately caused by hazardous waste disposed of at the time of their ownership or operation of the facility, the owner or operator has a strong incentive to engage voluntarily in cleanup efforts before the contamination worsens or the threat of contamination becomes a reality. Releasing the previous owner or operator from liability for the portion of harm shown to be caused by hazardous waste disposed of after the defendant has relinquished ownership of or control over the facility in no way weakens this incentive because a person no longer in a position to exert control over a hazardous waste facility obviously cannot initiate cleanup efforts at the facility.[12]
 
 
 103
 On remand, should the district court determine that the Township is an operator of the dump site, I would have it determine whether the Township met its burden of presenting evidence sufficient to find a reasonable basis for apportionment, consistent with the guidelines I have set forth.
 
 IV. Prejudgment Interest
 
 104
 With respect the United States' cross-appeal for prejudgment interest, I agree with Judge Boggs's analysis. On remand, the district court should award prejudgment interest if it imposes liability on Brighton Township after its operator and divisibility analysis.
 
 CONCLUSION
 
 105
 For the foregoing reasons, I respectfully CONCUR in the result.
 
 DISSENTING IN PART, CONCURRING IN PART
 
 106
 DOWD, District Judge, dissenting in part and concurring in part.
 
 
 107
 For the following reasons, I respectfully dissent in part and concur in part. I find the fact findings made by the district court in this case insufficient to provide a basis for determining which part of the fifteen-acre property comprises the "facility" for CERCLA purposes. Notwithstanding this fact, I would enter final judgment for the Township on the grounds that under the found facts, Brighton Township's actions were insufficient to render it liable as an "operator." I also dissent from the scope of the majority's remand, which improperly directs the district court to adopt "findings" of the appellate court. However, given the fact that there are two votes for holding the entire property a "facility," and two votes for a remand on "operator" liability, and in order to provide some sense of finality to this case, I concur with Judge Boggs on the issue of "divisibility." Finally, if the district court should conclude that the Township is liable, I concur that an award of prejudgment interest would be proper.
 
 
 108
 I. The Definition of "Facility"
 
 
 109
 Initially, I disagree with the majority's holding that the Township dump is included in the definition of "facility" under CERCLA. The majority notes that this question of how broadly or narrowly to define "facility" is a matter of first impression in this Circuit. The opinion then cites case law for the proposition that the key issue in this definition is the determination of "where the hazardous substances were 'deposited, stored, disposed of, ... or [have] otherwise come to be located.' " Northwestern Mutual Life v. Atlantic Research Corp., 847 F.Supp. 389, 395-96 (E.D.Va.1994). However, the majority continues, there is a limitation: "an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if contains parts that are non-contaminated."
 
 
 110
 With this brief explanation of the law, the majority then makes the conclusion that the entire property is the "facility:" "[i]n this case, even though township residents generally left their refuse in the southwest corner, it appears that the entire property was operated together as a dump." The majority thus rejects the argument that the Township dump was not included in the part of the property on which the hazardous waste was found. This conclusion is based on a number of "facts" listed by the majority as critical to this decision:
 
 
 111
 Collett often moved trash from one part of the property to another as part of his salvage operation, so that hazardous materials found in the rest of the facility might have originated in the township dump. Household appliances, the sort of object that residents discarded in the southwest corner, were moved out of the corner and across an access road, and placed in large piles. Furthermore, there was testimony that some township residents disposed of appliances in the northern part of the site, as well as testimony that barrels filled with local household trash were burned and buried with the help of a township contractor (though it is not clear if these burials were in the southwest corner, the "hot zone," or neither).
 
 
 112
 I cannot join the majority in holding that these facts support a decision that the entire property is the "facility" for the reason that these facts were never found by the district court judge. As a reviewing court, we cannot examine the underlying testimony and draw from it factual inferences that were not made by the district court. Fed.R.Civ.P. 52(a); see also Cordovan Associates, Inc., v. Dayton Rubber Co., 290 F.2d 858 (6th Cir.1961). We must, therefore, restrict our review to the facts found by the district court, and if they are insufficient, then we must remand the case for appropriate and complete findings. Fed.R.Civ.P. 52(a); see also Traylor v. United States, 396 F.2d 837 (6th Cir.1968).
 
 
 113
 In this case, the district court, in his oral opinion rendered at the conclusion of a three-day bench trial, did not address the issue of the boundary of the Township dump, nor did the district court make any findings concerning whether the property had any natural dividers, or whether particular pieces of trash were moved from one part of the property to another. In fact, the language used by the district court reveals its imprecise fact findings with regard to how much of the property actually constituted the Township dump: "From approximately 1960 to 1973, the relevant time period, a part of the property was used as a disposal area by Brighton Township residents." (Tr., Joint Appendix ["JA"] at 256)(emphasis added). The court never identified which "part of the property" was included, nor did it ever identify that area as the area in which the hazardous substances were found, or suggest that trash was moved from one part of the property to another as a matter of course.
 
 
 114
 In conclusion, I find that there are insufficient findings of fact on which to hold that the property was not naturally divided into separate corners, and similarly no findings of fact on which to conclude that the entire fifteen-acre property should be included in the definition of the "facility." For this reason, I dissent from the majority's holding that the entire 15-acre property is a "facility." Nonetheless, in view of the fact that I would enter judgment for the Township on the grounds that it was not an operator, I would not remand this issue of "facility."
 
 II. The "Actual Control" Standard
 
 115
 The majority concludes a remand is required to determine whether Brighton Township is an "operator" under CERCLA, using the "actual control" standard. While I agree with the adoption of the "actual control" standard for this Circuit, I disagree with both of my colleagues as to the elements of "actual control." In fact, I would enter final judgment for the Township on the grounds that its conduct did not constitute actual control under the standard recently set forth by the United States Supreme Court in United States v. Bestfoods, --- U.S. ----, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).
 
 
 116
 In Bestfoods, as the majority states, the Supreme Court defined "operator," as used in CERCLA, as follows:
 
 
 117
 [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.
 
 
 118
 Id. at 1887. Subsequently, the Court made a more narrow holding concerning specific activities that would and would not be sufficient for operator liability:
 
 
 119
 "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." [citation omitted]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.
 
 
 120
 Id. at 1889. While Bestfoods specifically addressed the question of "operator" liability relating to the corporate form, and this case involves the liability of a governmental entity, I find that the Bestfoods standard can and should be applied to the governmental entity situation. Therefore, I note my disagreement with my colleagues that a governmental entity should be held to a lower threshold level of control which would give rise to liability. Instead, I find that the Bestfoods standard should be applied to both the corporate form and the governmental entity situations. When this standard is applied to the instant case, I would hold that the found facts demonstrate that the Township's actions were insufficient to render it liable as an "operator."
 
 
 121
 As the case law demonstrates, the actual control standard applicable to a governmental entity is grounded in the notion that if an entity managed the day-to-day activities of a facility, then and only then should it be liable for the harm caused. See FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833, 844 (3d. Cir.1994) (en banc) (holding United States liable as "operator" due to exertion of "considerable day-to-day control" including maintaining significant degree of control over production process, building and controlling plants, supervising employee conduct, supplying machinery and controlling product marketing and price); see also U.S. v. Dart Indus., Inc., 847 F.2d 144, 146 (4th Cir.1988) (holding government entity not "operator" where there was no evidence that it directly managed the waste site's employees, finances or the day-to-day activities of the facility); United States v. New Castle County, 727 F.Supp. 854 (D.Del.1989) (holding state not liable as an operator where it only periodically inspected the site and merely mandated the details of refuse soil compaction and construction, but did not manage the day-to-day operations of the landfill). Therefore, the case law demonstrates that the criteria for finding such a high level of control over day-to-day operations include hiring and supervising the employees, and the control of the financial decisions of the facility. Although these cases were decided prior to the Bestfoods case, they are completely in line with Bestfoods' holding that an operator must "direct[ ] the workings of, manage[ ], or conduct[ ] the affairs of a facility." Bestfoods, --- U.S. at ----, 118 S.Ct. at 1887. In the instant case, however, the fact findings made by the district court are insufficient to hold the Township liable as an "operator."[1]
 
 
 122
 The district court made the following fact findings in this case:
 
 
 123
 During the relevant time period, the Township Board approved resolutions regarding the operation of the site.
 
 
 124
 In a Brighton Township Board Meeding [sic] held November 9, 1960, R. Beers, of the Brighton Township Board, presented the following resolution:
 
 
 125
 "Be it resolved that Vaughn Collett, of Collett Road, be granted a temporary permit to operate a dump for Brighton Township residents under the following conditions:
 
 
 126
 "1. Dump to meet specifications of and be under the supervision of the Board of Appeals.
 
 
 127
 "2. No garbage to be permitted.
 
 
 128
 "3. Township to pay $60.00 per month rental and $10.00 monthly toward maintenance from [sic] the General Fund.
 
 
 129
 "4. Township people to be admitted free of charge. But persons outside the Township may enter into private agreement regarding fees with Mr. Collett.
 
 
 130
 "5. Maintenance to be Mr. Collett's responsibility.
 
 
 131
 "6. Roads to be in passable condition for autos.
 
 
 132
 "7. Mr. Collett to have salvage rights."
 
 
 133
 ....
 
 
 134
 On November 21st, 1973, Brighton Township Board Meeting, J Collett's estimate or statement of work done to rehabilitate the old disposal site on Collett Road was reviewed and discussed, along with a letter from Jim Curtis, Township Engineer, regarding this subject.
 
 
 135
 A motion was made by H. Davis, seconded by N. Haviland, that [the Board] pay the bill submitted by J. Collett in the amount of $4,214.00 upon completion of work to the satisfaction of the Livingston County Health Department, the Township engineer, and the Township supervisor.
 
 
 136
 ....
 
 
 137
 Vaughn Collett and Jack Collett did maintain the daily operations of the dump, including setting hours of operation, directing residents where to dump various kinds of trash, deciding where and when to bury or burn refuse, and charging fees to non-Township residents seeking to dump there.
 
 
 138
 The Township did not exercise its control over the facility on a daily basis. However, there is sufficient evidence that the Township did maintain actual control over operations at the dump, as recorded by the Township at Board meetings.
 
 
 139
 (Tr., JA at 257-61).
 
 
 140
 These facts, as found by the district court judge, simply do not support a finding of actual control. The cases cited above make it clear that the actual control standard is grounded in the notion that if an entity managed the day-to-day activities of a facility, then it should be liable for the harm caused. The criteria for finding such a high level of control over day-to-day operations include hiring and supervising the employees, and the control of the financial decisions of the facility. FMC, supra, at 843. In the instant case, however, there are no facts to indicate that Brighton Township hired the employees of the dump, had the authority to supervise or fire them, or managed the finances of the dump.
 
 
 141
 In fact, the most that can be said is that Brighton Township maintained some regulatory control over the facility. Brighton Township granted Collett the permit to open the dump, and retained the authority to "supervise" the facility. (Tr., JA at 257). However, these regulatory powers alone cannot give rise to a finding of actual control in the absence of evidence of day-to-day management. See Bestfoods, --- U.S. at ----, 118 S.Ct. at 1889 (in corporate form, "activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." [citation omitted] ); see also Dart, supra, at 146 ("a series of regulatory actions" cannot serve as the basis for finding actual control existed).
 
 
 142
 Furthermore, the district court specifically found that the "daily operations" of the facility were managed by Collett. (Tr., JA at 260). "The Township did not exercise its control over the facility on a daily basis." (Tr., JA at 261). Therefore, under the clear fact findings of the district court, the day-to-day operations were not handled by Brighton Township, and thus Brighton Township cannot be found liable under the actual control standard.
 
 
 143
 In conclusion, for the reasons set forth above, it is my belief that the facts here do not constitute actual control by Brighton Township because day-to-day management of the facility by the Township is simply not present. At most, Brighton Township had some authority over the facility, but did not exercise this authority. As this is insufficient to constitute actual control, I respectfully dissent.
 
 
 144
 Further, as noted at the beginning of my dissent, I also dissent from the scope of the majority's remand. The majority states that although it is vacating and remanding the district court's opinion on the Township's status as an operator, the majority nonetheless "affirms" certain "findings by the district court regarding the release of hazardous substances." These "findings" that the majority "affirms," however are not restricted to the actual findings of fact made by the district court, but rather include some "findings" made by the majority after its own review of the testimony given at the three-day bench trial. I again note that the appellate court simply cannot engage in this sort of fact finding, but rather, must restrict its review to the fact findings made by the district court. Fed.R.Civ.P. 52(a); see also Cordovan Associates, Inc., v. Dayton Rubber Co., 290 F.2d 858 (6th Cir.1961). For this reason, I find the scope of the majority's remand improper, and thus note my dissent from it as well.
 
 
 145
 III. "Divisibility"
 
 
 146
 As I discussed earlier, I disagree with the majority's holding that the entire fifteen-acre property is the "facility." Nonetheless, there are two votes for holding it the "facility." Even though I disagree with that holding, and therefore would never reach the "flip side" issue of divisibility, and even though I am not in total agreement with either of my colleagues' definitions of "divisibility," in order to give the district court some guidance on the majority's remand, I concur with Judge Boggs' definition of "divisibility."
 
 IV. Prejudgment Interest
 
 147
 I also concur that if, on the remand directed by the majority, the Township is found to be liable as an operator, that the award of prejudgment interest would be proper.
 
 V. Conclusion
 
 148
 In conclusion, for the reasons set forth above, I respectfully dissent from the majority on the issues of "facility," liability as an "operator," and the scope of the majority's remand. Further, even though I would not reach either of these points, I concur with Judge Boggs' definition of "divisibility," and on the notion that prejudgment interest would be proper if the Township is found to be liable as an operator.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 This information is taken from the minutes of the Brighton Township Board. It is nowhere explained who or what the Township's Board of Appeals is, although Brighton Township explains that the two boards are separate official entities
 
 
 [2]
 In 1969, the board approved two appropriations (crane work for $500 and "digging and coverage" for $800), with payment contingent upon Collett's determination that the work had been done to his satisfaction. There is record only of the second appropriation actually being spent
 
 
 [3]
 For its part, the district court recognized that it was denominating the entire Collett property as the "facility," including the Brighton Township dump, but it referred to the entire site as "the Brighton township dump site."
 
 
 [4]
 There is another set of definitions of a facility in 42 U.S.C. § 9601(9)(A), which Judge Moore ably considers in her separate opinion
 
 
 [5]
 Contribution is not as important a consideration in this case as it is in many CERCLA cases, because there are only two defendants, Brighton Township and Jack Collett. Mr. Collett is probably judgment proof, and so divisibility may be Brighton Township's only opportunity to reduce its damages. However, there is nothing preventing Brighton Township from attempting to identify further responsible parties and seeking contribution from them
 
 
 [6]
 Governmental entities are not exempt from this designation. 42 U.S.C. § 9601(20)(D)
 
 
 [7]
 Our opinion should not be read to suggest, as Judge Dowd characterizes it, that "a governmental entity should be held to a lower threshold level of control." Op. at 333. Contrary to Judge Dowd's characterization, ibid., we apply the same plain-meaning standard articulated in Bestfoods to any context, whether the defendant is acting in a corporate, governmental, or any other capacity. To be sure, part of the application of the law to the facts in Bestfoods (quoted and relied upon by Judge Dowd, id. at 333.) rests on nuances of corporate structure, but that fact-specific application is not applicable to this case
 
 
 [8]
 Indeed, it is a defense to liability to establish that the act or omission of a third party caused the harm. 42 U.S.C. § 9607(b)(3). Brighton Township does not raise this defense, because the defense excludes from consideration those third parties to whom the putative operator is bound contractually. Ibid
 
 
 [9]
 Judge Moore offers some factors in her concurrence that should provide some assistance to the district court in determining whether a government entity is an operator or is merely a regulator. As the concurrence points out, however, ours is a fact-intensive inquiry. Precisely because this is a fact-intensive inquiry, district courts should not feel bound to weigh any factors that do not apply to the facts of their particular case
 All too often, lower courts transform our suggestions into requirements. No court should feel bound by the list of factors the concurrence has provided, helpful though it is. Rather, courts should see if the plain language of the statute applies--that is, whether the defendant is an "operator"--and should look to the results we and others have reached, and to the facts we have found most dispositive in reaching them. What courts should not do (and what the Supreme Court refused to do in Bestfoods, --- U.S. at ----, 118 S.Ct. at 1889), however, is take a list of reasons why the facts in one case led the court to a particular result, and transform it into a mechanical checklist of narrow and rigid factors.
 For instance, Judge Moore suggests that our district courts should consider, among other things, six factors out of the eleven factors decreed in United States v. Stringfellow, 1990 WL 488730, 20 Envtl. L. Rep. 20,656, 20,658 (C.D.Cal. Jan.9, 1990) ("There are eleven factors to look at."). There is no explanation why she leaves out several of the Stringfellow factors, or of why Stringfellow, an unpublished district court case, deserves to be written into Sixth Circuit law.
 
 
 [10]
 Brighton Township argues that, if the township's use of the facility contributed no hazardous waste to the site, and all of the hazardous waste on the site resulted from the Colletts' operations beyond the scope of Brighton Township's control over them (i.e., it came from non-residents), then Brighton Township cannot be considered an operator. In other words, Brighton Township's control over one part of the site should not make it liable by association for the disposal, over which it had no control, of hazardous materials on another part of the site
 This argument founders on the passive and expansive language of the statute, which makes liable "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). Since, as discussed in the last section, the entire site is defined as a single facility, if Brighton Township exercised authority over the facility, it is liable. The question that Brighton Township would have this court answer is whether the definition of an entity as an operator should take into account the extent of its control; that is, did Brighton Township's lack of control over Collett and the rest of the facility suffice to prevent its classification as an operator overall? But this is a question best answered in the divisibility analysis. See United States v. R.W. Meyer, Inc., 932 F.2d 568, 570-71 n. 2 (6th Cir.1991) ("Joint and several liability may be imposed on a responsible party, even though its role in creating the hazardous site was small, if the harm is indivisible."); United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1507 (6th Cir.1989) ("CERCLA has been interpreted to impose joint and several liability when the environmental harm is indivisible, and to allow for apportionment when two or more persons independently are responsible for a single harm that is divisible.") (citation omitted), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).
 
 
 [11]
 Judge Dowd's dissent notes two cases from other jurisdictions in which government entities were found not to be operators, and implies that there is an implicit requirement of control over "day-to-day operations" for government "operators." See Dart, supra; United States v. New Castle County, 727 F.Supp. 854 (D.Del.1989). In Dart, the Fourth Circuit found that the government's activities were not sufficiently "hands-on" to warrant a finding that the government entity was an operator as opposed to a mere regulator. Dart, 847 F.2d at 146. In New Castle, the court found that a government entity that merely regulated a disposal site, and only performed hands-on activities that the regulation required (such as dictating soil compaction standards), was not an operator. New Castle, 727 F.Supp. at 869
 In both of these cases, then, the dispositive question, as here, was whether the government entity was running the facility or merely regulating it. In the present case, Brighton Township took hands-on, non-regulatory action distinct from that of the entities in Dart and New Castle. Obviously the facts of this case are closer to Dart than they are to FMC, but our task is not to split the difference between two cases from other circuits and with distinguishable facts. Rather, our task is to say what the law is, and to apply that law to this set of facts.
 
 
 [12]
 Later in Meyer, we wrote that "CERCLA contemplates strict liability for landowners, who, absent a defense recognized under section 9607(b) [acts of God, acts of war, and acts of certain third parties], are deemed responsible for some of the harm." Meyer, 889 F.2d at 1507. Taken literally, this is clearly incompatible with the principle of divisibility Meyer establishes just above. We take this opportunity to clarify that defendants are limited to the defenses in § 9607(b) only when the harm is indivisible. See United States v. Alcan Aluminum Corp., 990 F.2d 711, 721-22 (2nd Cir.1993)
 
 
 [13]
 Brighton Township asks this court to reverse Meyer and apply a de novo standard. See In re Bell Petroleum Services, Inc., 3 F.3d 889, 902 (5th Cir.1993) (holding that the divisibility determination is a question of law). We see no reason to do so. As we conclude below, divisibility is a question of causation. In this circuit, questions of causation are subject to "clearly erroneous" review. Bell v. United States, 854 F.2d 881, 886 (6th Cir.1988)
 
 
 [14]
 This possible anomaly in CERCLA corresponds to one in the Restatement. Under the standard Restatement scheme--non-strict liability--the burden is initially on the plaintiff to prove that the defendant is responsible for the harm. Any defendant who can winnow his share of the blame down to zero presumably will do so at this initial causation stage, and avoid the divisibility exercise altogether. See Bell, 3 F.3d at 901. This anomaly is not a result of our analysis, however. Rather, it can be attributed to Congress's intent to incorporate the Restatement into CERCLA via the analysis of United States v. Chem-Dyne Corp., 572 F.Supp. 802 (S.D.Ohio 1983). See H.R.Rep. No. 99-253(I), 99th Cong., 1st Sess. 74, reprinted in 1986 U.S.C.C.A.N. 2835, 2856 ("fully subscrib[ing]" to Chem-Dyne rule)
 
 
 [15]
 The factors are so called because they were part of an unsuccessful amendment to CERCLA proposed by then-Representative Gore of Tennessee
 
 
 [16]
 Some of the Gore factors (1, 2, and 3) are compatible with causation analysis; others (5 and 6) reflect fairness concerns; at least one (4) does both
 
 
 [1]
 The dissent argues that in holding that the entire Collett property operated as a single facility, Judge Boggs and I improperly draw factual inferences from the record that were never made by the district court. Although the dissent correctly points out that the district judge failed to address whether the Collett property operated as a single facility, the facts I rely upon are not in dispute. Brighton Township concedes that "there was indeed, ultimately, 'refuse' throughout [the Collett] property." Def.-Appellant/Cross-Appellee's Reply/Response Br. at 22. Nor does the Township challenge Roten's testimony that Vaughn Collett moved waste from one part of the property to another, or point to any testimony or evidence contradicting Roten's testimony. Because these material facts do not appear to be in dispute, I see no reason to remand to the district court for further fact-finding on this matter
 
 
 [2]
 Although the statutory definition of the term "person" includes a state, the Supreme Court recently held that Congress's plenary power to regulate interstate commerce under the Interstate Commerce Clause does not grant Congress the power to waive state sovereign immunity embodied in the Eleventh Amendment by authorizing suits by private parties against unconsenting States. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 1127-1132, 134 L.Ed.2d 252 (1996) (overruling Pennsylvania v. Union Gas Co., 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989)). Seminole Tribe is inapplicable here, however, since in the case before us the United States, and not a private citizen, is seeking to recover cleanup costs from a township, which as a political subdivision of a state cannot claim sovereign immunity under the Eleventh Amendment. See Monell v. Department of Soc. Servs., 436 U.S. 658, 691 n. 54, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Hall v. Medical College of Ohio at Toledo, 742 F.2d 299, 301 (6th Cir.1984)
 
 
 [3]
 Section 9601(20) defines the term "owner or operator." Section 9601(20)(D) in its entirety reads as follows:
 The term "owner or operator" does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9706 of this title.
 42 U.S.C. § 9601(20)(D). Although the last sentence of this provision could reasonably be interpreted as limiting the exception created by the first portion of § 9601(20)(D), see Pennsylvania v. Union Gas Co., 491 U.S. 1, 53, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (White, J., concurring in the judgment in part and dissenting in part) (arguing that in introducing the last part with the phrase "[t]he exclusion provided under this paragraph shall not apply ..." means "the liability-creating portion of § 9601(20)(D) exists only as a 'limit' on the liability-limiting portion of § 9601(20)(D)"), a majority of the justices in Union Gas held that § 9601(20)(D) "obviously explains and qualifies the entire definition of 'owner or operator'--not just that part of the definition applicable to involuntary owners." Id. at 12-13, 109 S.Ct. 2273, overruled on other grounds, Seminole Tribe, 517 U.S. 44, 116 S.Ct. at 1128-32, 134 L.Ed.2d 252.
 
 
 [4]
 The Court majority in Union Gas relied upon the language in § 9601(20)(D) to support the proposition that Congress intended to treat the States and local governments in the "same manner" as nongovernmental entities in the context of whether a state that clearly was an operator of a hazardous waste site may "be liable along with everyone else for cleanup costs recoverable under CERCLA," Union Gas, 491 U.S. at 8, 109 S.Ct. 2273; the Court did not address whether courts must apply the same analysis in determining whether governmental and nongovernmental entities are operators
 
 
 [5]
 Judge Boggs correctly points out that the corporate-form cases are not directly applicable to the present case, which involves a governmental entity. Accordingly, I look to cases assessing the liability of governmental entities as operators of a facility under CERCLA for guidance
 
 
 [6]
 Judge Dowd argues that the Supreme Court's decision in Bestfoods requires the high standard he has adopted. I fail to see why the holding of Bestfoods mandates this approach. Bestfoods states in relevant part as follows:
 [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.
 Bestfoods, --- U.S. at ----, 118 S.Ct. at 1887. The Court thus left open the question of whether participation in a facility's pollution-related operations must involve substantial day-to-day control in order to hold a party liable as an operator for response costs. In addition, the Court went on to explain that in the context of determining a parent corporation's liability for response costs, activities of a parent corporation
 that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.
 Id. at 1889 (emphasis added). I see no reason why this principle is not equally applicable to cases arising outside the parent-corporation context. Therefore, contrary to Judge Dowd's position, the hiring or supervision of a facility's employees or control over a facility's financial decisions does not give rise to operator liability, unless of course such activities are "specifically related to pollution."
 
 
 [7]
 In the interest of avoiding confusion over the meaning of "day-to-day control," I would define "substantial control" or "active involvement" to mean "macromanaging a facility's operations," and avoid the term "day-to-day control" altogether
 
 
 [8]
 Although the phrase "from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" is incorporated in subparagraph (4), pertaining to transporters of hazardous substances, the legislative history shows that the phrase was intended also to modify subparagraphs (1)-(3). The predecessor to § 9607 appearing in the Senate's compromise bill, see 126 CONG. REC. 30,921 (1980), follows the Senate version as earlier reported in the Congressional Record, see id. at 30,908. In the Senate's bill, subparagraph (4) ended with the words "selected by such person," with a new line beginning "from which there is a release...." Apparently, due to a printer's error, the latter clause was merged into subparagraph (4) during the reprinting of the Senate compromise prior to the final vote. See id. at 30,961; see generally New York v. Shore Realty Corp., 759 F.2d 1032, 1043 n. 16 (2d Cir.1985)
 
 
 [9]
 As explained by the House Interstate and Foreign Commerce Committee, this deleted language required a causal nexus between a generator and the release causing the incurrence of response costs:
 The Committee intends that the usual common law principles of causation, including those of proximate causation, should govern the determination of whether a defendant 'caused or contributed' to a release or threatened release.... Thus, for instance, the mere act of generation or transportation of hazardous waste or the mere existence of a generator's or transporter's waste in a site with respect to which cleanup costs are incurred would not, in and of itself, result in liability under section 3071. The Committee intends that for liability to attach under this section, the plaintiff must demonstrate a causal or contributory nexus between the acts of the defendant and the conditions which necessitated response action under section 3041.
 H.R. REP. NO . 96-1016, at 33-34 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6136-37.
 
 
 [10]
 Although § 9607(a) does not require proof of causation in order to hold liable one of the persons enumerated therein, the divisibility defense brings causation "back into the case--through the backdoor, after being denied entry at the front door" Alcan Alum., 990 F.2d at 722. Congress had a chance to address this apparent anomaly in 1986 when it passed the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99-499, 100 Stat. 1613 (1986). Rather than amend CERCLA to require joint and several liability in every case, however, Congress indicated its approval of the common law approach allowing for apportionment followed in Chem-Dyne and subsequent cases. See 132 CONG. REC. 29,716, 29,737 (daily ed. Oct. 8, 1986) (statement of Representative Dingell, explaining that "[n]othing in this legislation is intended to change the application of the uniform Federal rule of joint and several liability enunciated in the Chem-Dyne case" and that "the standard of potentially responsible parties at Superfund sites is strict, joint and several, unless the responsible parties can demonstrate that the harm is divisible," and statement of Representative Glickman indicating that SARA follows the result in Chem-Dyne and "traditional and evolving principles of common law")
 
 
 [11]
 Because under CERCLA's strict liability scheme we must focus solely on causation to the exclusion of more equitable factors related to a party's culpability, I concur with Judge Boggs's conclusion that CERCLA rejects the "Gore factors," which as Judge Boggs correctly notes incorporate into the divisibility analysis "broad equitable bases of apportionment." Maj. op. at 318
 
 
 [12]
 Judge Boggs argues that a previous operator who shows that its "operating" activities were limited to a portion of the facility may assert a geographic basis for apportionment if the releases onto or from its portion of the facility represent a discrete and measurable harm. I disagree. Allowing Brighton Township to assert a geographic basis for apportionment would completely undermine our earlier analysis that Brighton Township was an operator of the entire facility. Moreover, allowing a geographically based divisibility defense would seriously weaken CERCLA's remedial scheme. An operator who can escape liability when its operational activities were limited to a discrete portion of the facility has no incentive to engage in the voluntary cleanup of the contamination caused by hazardous waste disposed of on the remaining portion of the facility
 
 
 [1]
 I again note that, as a reviewing court, we must restrict our review to the facts found by the district court, and not make factual findings of our own. Cordovan Assoc., supra